KAM SHING CHAN, Kam Tai Chan, Jing Yi Chen, Shan Non Chiu, Bak Lok Chu, Kok Kun Chu, Israel Gonzalez, Sui Bin Huang, Jian Ning Jiang, Kam Fai Kwok, Moon Shuen Kwong, Wei Xiang Lee, Yang I Lee, Young Shi Lee, Bing Zhao Li, Hao Hui Li, Kei Man Li, Wai Tai Li, Chi Kwong Liu, Jack Ye Louie, Sheng Hua Lu, Ting Guang Mai, Cheuk Ming Ng, Kin Chung Ng, Kin Hin Ng, Shun Guo Shen, Ten Jen Shen, Hau Wing Sin, Vein Dinh Sintruong, Wing Shing Tse, Wai Man Wan, Kong Htyan Wu, Xu Ming Wu, Guo Xuan, Yue Nam Zhu, Plaintiffs,

v.

CITY OF NEW YORK, Department of Housing Preservation and Development of the City of New York, and Chinese–American Planning Counsel, Inc., Defendants.

No. 90 Civ. 5653 (RJW).

United States District Court, S.D. New York.

June 5, 1992.

Opinion on Motion to Modify, Sept. 8, 1992.

YCDA was a local issue and there were no prohibitions or directions of the Federal Government concerning that issue."

Ellen Dichner, James Reif, Gladstein, Reif & Meginniss, Michael Shen, Shneyer & Shen, Asian American Legal Defense and Education Fund, New York City, for plaintiffs.

O. Peter Sherwood, Corp. Counsel of City of New York, New York City (Beth Peritz, Goodwin Benjamin, John P. Woods, of counsel), for defendants City of New York and Dept. of Housing Preservation and Development of City of New York.

Jay S. Berke, Nicholas J. Pappas, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant Chinese–American Planning Counsel, Inc.

## OPINION

ROBERT J. WARD, District Judge.

Chinese–American Planning Counsel, Inc. ("CPC") has moved to dismiss plaintiffs' First Amended Verified Complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief can be granted. The City of New York ("the City") and the Department of Housing Preservation and Development of the City of New York ("HPD") (collectively "the municipal defendants") have moved to dismiss the First Amended Complaint pursuant to Rule 12(b)(1), Fed.R.Civ.P., for lack of jurisdiction over the subject matter and/or Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief can be granted.[1]

By order dated July 26, 1991, the motions were referred to the Honorable James C. Francis IV, United States Magistrate Judge, to hear and report pursuant to 28 U.S.C. § 636(b)(1)(B). On January 6, 1992, Magistrate Judge Francis filed a Report

---

**1.** At the pre-motion conference on November 30, 1990, the Court gave defendants leave to file motions to dismiss only plaintiffs' federal claims. The Court indicated that it would consider whether to permit motions to dismiss plaintiffs' state claims after deciding the instant motions.

and Recommendation ("the Report"), in which he recommended that the motions to dismiss be granted in their entirety. Plaintiffs timely filed objections to the Report. For the reasons that follow, the Court denies defendants' motions in part, grants them in part, and modifies the magistrate judge's findings and recommendations in accordance with this opinion.[2]

## BACKGROUND

Kam Shing Chan and the other plaintiffs seek to recover back wages, which they claim are due them under 42 U.S.C. § 5310 and applicable contracts, from CPC and the municipal defendants.[3] Plaintiffs also seek liquidated damages and attorneys' fees.

According to plaintiffs, from 1986 to 1989, CPC entered into a series of three annual contracts with HPD (the "CPC/HPD Contracts") for the "performance of construction, repair and rehabilitation work on real estate owned by the City of New York". Complaint at ¶ 44. Plaintiffs are laborers that CPC employed to perform the work required under the terms of these contracts.

The CPC/HPD Contracts were funded in whole or in part under Title I of the Hous-ing and Community Development Act of 1974 ("HCDA"), 42 U.S.C. § 5301 et seq., which provides that "[t]he primary objective of this [title] is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." Id. § 5301(c).

42 U.S.C. § 5310, which is part of Title I of the HCDA, provides, in relevant part, that:

> All laborers and mechanics employed by contractors or subcontractors in the performance of construction work financed in whole or in part with assistance received under this chapter shall be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis–Bacon Act, as amended (40 U.S.C. 276a— 276a–5).... The Secretary of Labor shall have, with respect to such labor standards, the authority and functions set forth in Reorganization. Plan Numbered 14 of 1950[4] (15 F.R. 3176; 64 Stat. 1267) and section 276c of Title 40.

---

**2.** In their submissions to the Court, the parties make several references to Charles Dickens' *A Tale of Two Cities.* According to a recent article, this novel was the eighth most commonly assigned book in public high schools in 1963, when it was assigned to 33% of all students. *Shakespeare Then, Shakespeare Now: What They Read in High School,* N.Y. Times, May 20, 1992, at B8. By 1988, however, this classic of English literature had fallen off the top ten list. Perhaps a more timely literary reference would be to Harper Lee's *To Kill a Mockingbird* (number four on the list in 1988, assigned to 74% of public high school students). Defendants' instant motions are undoubtedly an effort "to kill a complaint".

**3.** In their complaint, plaintiffs assert that they were subjected to deprivations of their rights secured by 42 U.S.C. § 5310, in violation of 42 U.S.C. § 1983. First Amended Verified Complaint ¶¶ 56–61. Nowhere in the complaint do plaintiffs explicitly allege that they have an implied private right of action to enforce 42 U.S.C. § 5310. Indeed, it is in their Memorandum in Opposition to Motions to Dismiss Statutory Claims, at 14–23, not in the complaint, that plaintiffs first make this legal argument with specificity. *See also* Memorandum of Law in Reply to Plaintiffs' Memorandum of Law in Opposition to Municipal Defendants' Motion to Dismiss the Complaint at 6–7; Defendant CPC's Reply to Plaintiffs' Memorandum in Opposition to CPC's Motion to Dismiss Count I at 1–2. Nevertheless, because courts are "required to read the complaint with great generosity on a motion to dismiss," *Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555, 558 (2d Cir.1985) (citing *Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–103, 2 L.Ed.2d 80 (1957)), the Court finds an implied "implied private right of action" claim in the instant complaint and will therefore address that claim in its opinion. This was also the finding of the magistrate judge. Report and Recommendation at 10. Thus, each defendant has had two opportunities (once in their reply memoranda to their motions to dismiss and once in their responses to the objections to the magistrate judge's report and recommendations) to address plaintiffs' assertion that there is an implied private right of action pursuant to § 5310.

**4.** Reorganization Plan Numbered 14 of 1950 ("the Reorganization Plan") authorizes the Secretary of Labor to make reasonable regulations to ensure compliance with the Davis–Bacon Act and related statutes, such as the HCDA. The regulatory regime established under the Reorga-

Because the CPC/HPD Contracts were funded under Title I of the HCDA, they were subject to, *inter alia,* the provisions of § 5310. This was explicitly stated in the CPC/HPD Contracts, which provided, in a section entitled "Federal Supplemental Terms and Conditions," that:

> [CPC] acknowledges that this Agreement is funded under a program providing direct financial assistance from the Federal government to the City and HPD and is subject to, and the Contractor shall comply with, the requirements of all applicable Federal Statutes, rules and regulations, including, but not limited to, those set forth in Exhibit F attached to this agreement.

Included among the "applicable Federal Statutes" in Exhibit F were Title I of the HCDA, as well as the Davis–Bacon Act.

Plaintiffs assert that they were not paid prevailing wage rates, as determined by the Secretary of Labor. In their Memorandum in Opposition to Motions to Dismiss Statutory Claims, plaintiffs state that municipal defendants issued a Request for Proposals ("RFP") and ultimately signed a contract with CPC which provided that the Person Day Rate applicable to the HCDA work could not exceed $90 per diem.[5] Plaintiffs argue that, once CPC's other expenses were deducted, the $90 cap on the Person Day Rate "ensured that each [laborer] would be paid at far below the prevailing wage rate." *Id.* at 4.

### DISCUSSION

Defendants' motions present this Court with two distinct, yet related, areas of inquiry. First, the Court must determine whether 42 U.S.C. § 5310 creates a right of action under 42 U.S.C. § 1983. This inquiry turns on: (a) whether defendants were acting under color of state law; (b) whether 42 U.S.C. § 5310 creates an enforceable "right, privilege or immunity," as required

under 42 U.S.C. § 1983; and (c) whether Congress intended to foreclose a 42 U.S.C. § 1983 right of action under 42 U.S.C. § 5310. Second, the Court must ascertain whether plaintiffs have an implied private right of action under 42 U.S.C. § 5310.

Part (a) of the first inquiry requires a fact-specific analysis. Parts (b) and (c) of the first inquiry, as well as the second inquiry, present questions of statutory interpretation which are issues of first impression for the federal courts.

After discussing the standards to be applied when reviewing a magistrate judge's report and recommendations and deciding a Rule 12(b)(1) or 12(b)(6) motion to dismiss, the Court will turn to these substantive issues.

### A. *Standards for Reviewing a Magistrate Judge's Report and Recommendations*

To accept the Report and Recommendations of a magistrate judge to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record. *See* Rule 72, Fed.R.Civ.P., Notes of Advisory Committee on Rules (citing *Campbell v. United States Dist. Court,* 501 F.2d 196, 206 (9th Cir.), *cert. denied,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974)). 28 U.S.C. § 636(b)(1) affords the district court broad latitude in considering a magistrate judge's recommendation, even if no party objects to it. *Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir.1989). When timely objection has been made to a portion or portions of a magistrate judge's report, however, the district judge must "make a de novo determination ... of any portion of the magistrate's disposition to which specific written objection has been made." Rule 72(b), Fed.R.Civ.P. *See also,* 28 U.S.C. § 636(b)(1). The judge may then accept, reject, or modi-

---

nization Plan allows contractors and laborers to challenge the setting and application of Davis–Bacon wage standards and provides for contractors to be debarred for up to three years from eligibility for applicable contracts as a deterrent to the willful violation of labor standards in federal contracting. Significantly, the Reorga-

nization Plan does not provide for an action by laborers for back wages claimed under the Davis–Bacon standards.

**5.** The Person Day Rate increased to $95 per day for the second and third round of RFPs and contracts.

fy, in whole or in part, the magistrate judge's proposed findings and recommendations. 28 U.S.C. § 636(b)(1).

A district court's obligation to make a *de novo* determination of properly contested portions of a magistrate judge's report does not require that the judge conduct a *de novo* hearing on the matter. *United States v. Raddatz*, 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980). It is sufficient that the district court "arrive at its own, independent conclusion about those portions of the [magistrate judge's] report to which objection is made." *Hernandez v. Estelle*, 711 F.2d 619, 620 (5th Cir.1983). To this end, the court must "exercise . . . sound judicial discretion with respect to whether reliance should be placed on [the magistrate judge's] findings." *American Express Int'l Banking Corp. v. Sabet*, 512 F.Supp. 472, 473 (S.D.N.Y.1981), *aff'd without opinion*, 697 F.2d 287 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982).

**B. Standards for Dismissal Pursuant to Rules 12(b)(1) and 12(b)(6)**

1. Rule 12(b)(1)

Municipal defendants have moved to dismiss the First Amended Verified Complaint pursuant to Rule 12(b)(1), Fed.R.Civ.P., for lack of jurisdiction over the subject matter. When such a defense is asserted, " 'the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined.' " *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir.1990) (quoting 5 C. Wright and A. Miller, *Federal Practice and Procedure*, § 1350, p. 548 (1969)).

Plaintiffs claim subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. Section 1331, which confers jurisdiction when there is a federal question, provides that, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States." Inasmuch as this action arises under 42 U.S.C. § 1983, as well as under 42 U.S.C. § 5310, there is the requisite subject matter jurisdiction pursuant to 28 U.S.C. § 1331.[6]

In accordance with this analysis, the portion of municipal defendants' motion made pursuant to Rule 12(b)(1) is denied.

2. Rule 12(b)(6)

In considering a motion to dismiss for failure to state a claim upon which relief may be granted, a court is required to accept the facts alleged in the complaint as true. *Frasier v. General Electric Co.*, 930 F.2d 1004, 1007 (2d Cir.1991) (citing *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964)). The complaint includes any written instrument attached to it as an exhibit and any statements or documents incorporated into it by reference. *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir.1985).

In the instant case, the CPC/HPD Contracts and the RFPs were neither attached to the complaint nor incorporated into it by reference. It is undisputed by the parties, however, that these documents are properly before the Court on this motion to dismiss, because plaintiffs clearly had notice of these documents and relied upon them in framing the complaint. *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d at 48; Memorandum of Law in Support of Municipal Defendants' Motion to Dismiss the Complaint at 4 n. 2; Plaintiffs' Memorandum in Opposition to Motions to Dismiss Statutory Claims at 3 n. 1.

The court must read the complaint generously, and draw all reasonable inferences in favor of plaintiffs. *Pross v. Katz*, 784 F.2d 455, 457 (2d Cir.1986). The complaint may be dismissed only if "it appears be-

---

**6.** Because this Court finds subject matter jurisdiction pursuant to 28 U.S.C. § 1331, it is unnec- essary to decide whether jurisdiction exists pursuant to 28 U.S.C. § 1337.

yond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991). Thus, "[t]he function of a [Rule 12(b)(6)] motion to dismiss 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)). The Court now turns to the legal feasibility of plaintiffs' federal claims.

### C. *Plaintiffs' § 1983 Claim*

The Court must determine whether 42 U.S.C. § 5310 provides plaintiffs with a cause of action pursuant to 42 U.S.C. § 1983, which provides, in relevant part,

[e]very person who, *under color of any statute, ordinance, regulation, custom, or usage, of any State ...,* subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the *deprivation of any rights, privileges, or immunities secured by the Constitution and laws,* shall be liable to the party injured in an action at law, suit in equity, or any other proper proceeding for redress.

(emphasis added)

In their motions to dismiss, defendants assert that plaintiffs cannot satisfy either the "state action" or the "rights, privileges or immunities" requirement. Further, defendants assert that there is no § 1983 right of action, because Congress intended to foreclose such a right of action under § 5310. The Court now turns to these arguments.

### 1. Were Defendants Acting Under Color or of State Law?

■ To state a claim against a private actor under § 1983, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional or unlawful act. *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992), *petition for cert. filed,* May 20, 1992. Defendants assert that plaintiffs' complaint fails to allege facts which would establish that CPC's alleged failure to pay prevailing wages was under color of state law. Plaintiffs bear the burden of proving that the acts of private entities constitute state action for purposes of § 1983. *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1732, 56 L.Ed.2d 185 (1978); *Hadges v. Yonkers Racing Corp.,* 918 F.2d 1079, 1082 n. 3 (2d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1583, 113 L.Ed.2d 648 (1991).

The Second Circuit has recently addressed the issue of when private conduct qualifies as state action for § 1983 purposes. In *Hadges,* the court was asked to decide whether the Yonkers Racing Corporation ("YRC"), as the private owner of a racetrack licensed by the State of New York to conduct parimutuel wagering on harness races, engaged in § 1983 state action when it denied Hadges' application to work at YRC's racetrack. Hadges contended that YRC's denial of his application amounted to § 1983 state action because YRC was subject to pervasive New York State statutory and regulatory control, and because it generated significant tax revenues for the State, received State tax credits, and held a monopoly over harness racing in the New York metropolitan area. *Id.* at 1080–81.

The Court identified two independent tests for determining whether there is state action: the symbiotic relationship test and the close nexus test. Either test is sufficient to establish § 1983 state action.

### a. *The Symbiotic Relationship Test*

■ Private action is transformed into state action under this test when "'[t]he State has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity.'" *Hadges v. Yonkers Racing Corp.,* 918 F.2d at 1081 (quoting *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961)).

In *Burton*, where this test was first articulated by the Supreme Court, the owner of a private restaurant that leased space in a state-owned building refused to serve an African–American. The Court found that the restauranteur's action qualified as § 1983 state action because the state owned the building, as well as an adjacent parking lot, and thus had a direct financial interest in the restaurant's success. In addition, the state had dedicated the building for public purposes, thereby conferring tax exempt status on the building. *Hadges v. Yonkers Racing Corp.*, 918 F.2d at 1082 (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. at 723–24, 81 S.Ct. at 860–61).

While courts are to search for "nonobvious involvement of the State in private conduct," *Burton v. Wilmington Parking Auth.*, 365 U.S. at 722, 81 S.Ct. at 860, the Second Circuit in *Hadges* did not find the nature or extent of state involvement that was present in *Burton*. In contrast to *Burton*, the State in *Hadges* did not have a proprietary interest in Yonkers Raceway, which was purchased and maintained by private, not public dollars. Furthermore, the State in *Hadges* did not own a neighboring, interlinked business, and consequently lacked the direct financial stake in YRC's success that was present in *Burton*. While YRC received tax credits from the State, YRC did not enjoy the State's tax-exempt status. Finally, the *Hadges* court noted that the State did receive greater revenues if YRC prospered, but the court held that if such a link were sufficient to forge a symbiotic relationship between YRC and the State, then the actions of every successful corporation within the State would qualify as state action. *Hadges v. Yonkers Racing Corp.*, 918 F.2d at 1082.

In sum, the symbiotic relationship test seeks to establish whether the overall interests of the government and the private actor overlap to such an extent as to virtually coincide.

### b. *The Close Nexus Test*

■ Whereas the symbiotic relationship test focuses on the state's overall relationship with the private actor, the close nexus test specifically examines the state's link to the challenged action. *Hadges v. Yonkers Racing Corp.*, 918 F.2d at 1082. Under this test, private action is transformed into state action when " 'there is a sufficiently close nexus between the State and the challenged action' that the private party's action 'may be fairly treated as that of the State itself.' " *Id.* at 1081 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974)).

■ The "close nexus" standard is a difficult one to attain. For example, the mere fact that a business is subject to state regulation does not by itself convert its action into that of the state. *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 544, 107 S.Ct. 2971, 2985, 97 L.Ed.2d 427 (1987). Nor does the fact that the regulation is extensive and detailed, as in the case of most privately-owned utilities, create state action. *Jackson v. Metropolitan Edison Co.*, 419 U.S. at 350, 95 S.Ct. at 453. Furthermore, even when an entity benefits from state-conferred monopoly status, this is not sufficient state action for § 1983. *Id.* at 351–52, 95 S.Ct. at 453–54. Indeed, the government may subsidize private entities without assuming constitutional responsibility for their actions. *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. at 544, 107 S.Ct. at 2985 (citing *Blum v. Yaretsky*, 457 U.S. 991, 1011, 102 S.Ct. 2777, 2789, 73 L.Ed.2d 534 (1982); *Rendell–Baker v. Kohn*, 457 U.S. 830, 840, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982)). "The fact 'that a private entity performs a function which serves the public does not make its acts governmental action.' " *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. at 544, 107 S.Ct. at 2985 (quoting *Rendell–Baker v. Kohn*, 457 U.S. at 842, 102 S.Ct. at 2771.). Of relevance to the instant case, private entities who contract with the government are not necessarily government actors. *Rendell–Baker v. Kohn*, 457 U.S. at 840–41, 102 S.Ct. at 2770–71 (a "school ... is not

fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts.") Furthermore, " 'mere approval of or acquiescence in the initiatives' of [a private actor] ... is not enough to make the [private actor's] actions those of the Government." *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. at 547, 107 S.Ct. at 2986 (quoting *Blum v. Yaretsky*, 457 U.S. at 1004–05, 102 S.Ct. at 2785–86).

Thus the close nexus test establishes a relatively small range of government action for purposes of § 1983: *"a government 'normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the government'"*. *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. at 546, 107 S.Ct. at 2986 (quoting *Blum v. Yaretsky*, 457 U.S. at 1004, 102 S.Ct. at 2785; *Rendell–Baker v. Kohn*, 457 U.S. at 840, 102 S.Ct. at 2770) (citing *Flagg Brothers, Inc. v. Brooks*, 436 U.S. at 166, 98 S.Ct. at 1738; *Jackson v. Metropolitan Edison Co.*, 419 U.S. at 357, 95 S.Ct. at 456; *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170, 90 S.Ct. 1598, 1615, 26 L.Ed.2d 142 (1970)) (emphasis added).

Upon application of the close nexus test, the *Hadges* court found no state action, holding that "there is no evidence that a State official participated in YRC's decision to deny Hadges's application." [7] *Hadges v. Yonkers Racing Corp.*, 918 F.2d at 1083.

### c. The Symbiotic Relationship Test and Close Nexus Test as Applied to the RFPs and CPC/HPD Contracts

In determining whether either of these tests results in a finding of § 1983 state action, this Court must ultimately undertake a detailed factual inquiry. "Neither of these tests lends itself to formulaic applications. Instead, both of these inquiries requires us to sift through and weigh the facts to determine whether the alleged ties between the State and the private actor are sufficiently strong to attribute the private actor's conduct to the state." *Hadges v. Yonkers Racing Corp.*, 918 F.2d at 1081 (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. at 722, 81 S.Ct. at 860). *See also Jackson v. Metropolitan Edison Co.*, 419 U.S. at 351, 95 S.Ct. at 453 ("The true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required in order to determine whether the test is met." (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S.Ct. 856)). For purposes of the instant motions to dismiss, in accordance with Rule 12(b)(6) standards, the Court will accept the facts alleged in the complaint as true and will consider the CPC/HPD Contracts and the RFPs.

█ CPC was not a state actor under the symbiotic relationship test. Neither municipal defendant had the sort of interdependent economic interest that is required under the *Burton* test. Municipal defendants did not share a proprietary interest with CPC in the work being done. Nor did the municipal defendants have an "interlinked" business, as was the case with the State's parking lot in *Burton*. For these reasons, the symbiotic relationship test does not establish § 1983 state action in the instant case.

█ Under the close nexus test and the facts presently before the Court, however, CPC can be said to be a state actor. On

---

**7.** However, the *Hadges* court did cite to *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 599 (3d Cir.1979), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 814 (1980), where the Third Circuit held that if a State official "personally and actively participated" in a race- track's decision to expel a driver, state action existed. Thus the *Hadges* court acknowledged that there are circumstances where the close nexus test does create § 1983 state action. *Hadges v. Yonkers Racing Corp.*, 918 F.2d at 1083.

the basis of the CPC/HPD Contracts and the RFPs, plaintiffs have alleged facts which, if proven true, would demonstrate that municipal defendants had "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the government." *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. at 546, 107 S.Ct. at 2986 (citations omitted). In particular, plaintiffs assert that the $90–95 cap on the Person Day Rate, which was required by municipal defendants as a condition for awarding the contract, was so low as to make it financially impossible for CPC to pay prevailing wage rates as required under 42 U.S.C. § 5310. In short, plaintiffs have alleged facts asserting that the municipal defendants ensured that any successful bidder would be forced, for economic reasons, to violate 42 U.S.C. § 5310. If proven true, these facts would be sufficient to demonstrate that the municipal defendants "exercised coercive power or ... provided such significant encouragement" as to establish 42 U.S.C. § 1983 state action under the close nexus test.[8]

▪ Finally, municipal defendants argue that plaintiffs have failed to adequately plead the existence of a municipal custom, practice or policy which caused plaintiffs' injuries. However plaintiffs did allege that HPD's conduct "was pursuant to official custom, policy and usage." Amended Complaint at ¶ 55. Moreover, it strains credulity to assert, as municipal defendants have, that a series of contracts, worth millions of dollars in the aggregate, and signed by the Commissioner of HPD, do not reflect official policy or usage.[9]

2. Does 42 U.S.C. § 5310 Create a "Right, Privilege or Immunity," as Required Under 42 U.S.C. § 1983?

a. *The Existing Framework*

The jurisprudence concerning whether a given statute creates a right, privilege or immunity enforceable under § 1983 is in a state of flux. In *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Supreme Court applied a well-established, three-part test in finding that the Boren Amendment to the Medicaid Act created such a right. However in *Suter v. Artist M.*, —— U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), decided approximately two months ago, the Supreme Court chose not to explicitly apply the *Wilder* framework when determining whether such a right exists, although it did not explicitly overrule *Wilder* and provided no alternative analytic framework. Because the *Wilder* framework was not explicitly overruled,[10] this Court will apply the *Wilder* framework, with the modifications suggested by *Suter*, in ascertaining

---

**8.** Municipal defendants have argued that, because part of CPC's contractual mandate was to provide off-site "life skills" training to plaintiffs, and thus plaintiffs were not laboring on-site for CPC on a full-time basis, the $90–95 Person Day Rate was sufficient to allow CPC to pay the prevailing minimum wage during those hours of the week when plaintiffs were actually providing labor services. *See* Memorandum of Law in Reply to Plaintiffs' Memorandum of Law in Opposition to Municipal Defendants' Motion to Dismiss the Complaint at 26. This assertion, while relevant to the ultimate adjudication of this action, concerns a factual argument raised by defendants that is not properly before the Court on a Rule 12(b)(6) motion to dismiss.

**9.** Because the Court has found state action under the close nexus test, it is unnecessary to address plaintiffs' conspiracy claim, First Amended Verified Complaint at ¶ 53, at the present time.

**10.** Justice Blackmun, in a stinging dissent, indicates that the *Suter* majority is dramatically altering, if not overruling, *Wilder*:

> the Court has failed, without explanation, to apply the framework our precedents have consistently deemed applicable; it has sought to support its conclusion by resurrecting arguments decisively rejected less than two years ago in *Wilder*; and it has contravened 22 years of precedent by suggesting that the existence of other "enforcement mechanisms" precludes § 1983 enforcement. At least for this case, it has changed the rules of the game without offering even minimal justification, and it has failed even to acknowledge that it is doing anything more extraordinary than "interpreting" the [relevant act] "by its own terms." Readers of the Court's opinion will not be mislead by this hollow assurance.

*Suter v. Artist M.*, 112 S.Ct. at 1377.

whether 42 U.S.C. § 5310 created a right enforceable under § 1983.[11]

▇▇▇ Section 1983 provides a cause of action for violations of federal statutes as well as the Constitution. *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980); *Wilder v. Virginia Hospital Ass'n*, 110 S.Ct. at 2517. There is no cause of action, however, when " 'the statute does not create enforceable rights, privileges, or immunities within the meaning of § 1983' " *Id.* (quoting *Wright v. Roanoke Redevelopment and Housing Auth.*, 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)).

▇▇▇▇ Under this exception, a mere violation of federal law is not sufficient to trigger § 1983. Rather plaintiff must demonstrate that he or she was deprived of a right, privilege, or immunity. *Wilder v. Virginia Hospital Ass'n*, 110 S.Ct. at 2517; *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989). In determining whether such a right, privilege or immunity exists, the Court must ascertain (1) whether " 'the [statutory] provision in question was intended to benefit the putative plaintiff' " *Wilder v. Virginia Hospital Ass'n*, 110 S.Ct. at 2517 (quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. at 106, 110 S.Ct. at 448). If so, the provision creates an enforceable right unless (2) "it reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit," *Wilder v. Virginia Hospital Ass'n*, 110 S.Ct. at 2517 (citing *Pennhurst State School and Hosp. v. Halderman*, 451 U.S. 1, 19, 101 S.Ct. 1531, 1541, 67 L.Ed.2d 694 (1981)), or unless (3) the asserted interest is " 'too vague and amorphous' such that it is 'beyond the competence of the judiciary to enforce.' " *Wilder v. Virginia Hospital Ass'n*, 110 S.Ct. at 2517 (quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. at 108, 110 S.Ct. at 449; *Wright v. Roanoke Redevelopment and Housing Auth.*, 479 U.S. at 431–32, 107 S.Ct. at 774–75).

Applying this test in *Wilder*, the Supreme Court found that the Boren Amendment to the Medicaid Act created a right enforceable by health care providers under § 1983. First, the Court found that "[t]here can be little doubt that health care providers are the intended beneficiaries of the Boren Amendment. The provision ... is phrased in terms of benefitting health care providers." *Wilder v. Virginia Hospital Ass'n*, 110 S.Ct. at 2517–18. Second, the *Wilder* court found that the Boren Amendment was "cast in mandatory rather than precatory terms: the state plan 'must' 'provide for payment of hospitals.' " *Wilder v. Virginia Hospital Ass'n*, 110 S.Ct. at 2519. " 'The Boren Amendment's language succinctly sets forth a congressional command, which is wholly uncharacteristic of a mere suggestion or 'nudge' ' " *Wilder v. Virginia Hospital Ass'n*, 110 S.Ct. at 2519 (quoting *West Virginia University Hospitals, Inc. v. Casey*, 885 F.2d 11, 20 (3d Cir.1989)).

The *Suter* court did not explicitly apply the three-part "right" test of *Wilder* and its precursors. Although the Court did not provide an analytic framework for deciding § 1983 right of action cases, it did establish certain guidelines to be followed in determining whether there is a § 1983 right of action.

In *Suter*, the Court held that there is no private right of action to enforce the Adoption Assistance and Child Welfare Act of 1980 (the "AACWA"), either implicitly, under the AACWA itself, or through a § 1983 action. The *Suter* court distinguished the AACWA from the statute in *Wilder*, writing that, "in [*Wilder*], we held that the Boren Amendment actually required the States to adopt reasonable and adequate rates, and that this obligation was enforceable by the providers. We relied in part on the fact that the statute and regulations set forth in some detail the factors to be considered in determining the methods for calculating rates." *Suter v. Artist M.*, 112 S.Ct. at 1368. The *Suter* court concluded that, in providing that the State exercise

---

**11.** In the approximately two months since *Suter* was decided, no federal court has addressed the issue of whether the *Wilder* framework is still good law.

"reasonable efforts" in maintaining an abused or neglected child in his home or return the child to his home from foster care, the AACWA left the question of how to define "reasonable efforts" up to the State. *Id.* Thus, the Court reasoned, the AACWA did not create an enforceable right.

In addition, the *Suter* court wrote that, "[c]areful examination of the language [requiring 'reasonable efforts'], in the context of the entire [AACWA], leads us to conclude that the 'reasonable efforts' language does not *unambiguously confer* an enforceable right upon the [AACWA's] beneficiaries. The term 'reasonable efforts' in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary." *Id.* at 1370 (emphasis added). Thus, under *Suter*, any right must be unambiguously conferred.

Finally, the Court noted that the regulations promulgated by the Secretary of Health and Human Services to enforce the AACWA

> do not evidence a view that [the AACWA] places any requirement for state receipt of federal funds other than the requirement that the State submit a plan to be approved by the Secretary.... What is significant is that the [AACWA] regulations are not specific, and do not provide notice to the States that failure to do anything other than submit a plan with the requisite features, to be approved by the Secretary, is a further condition on the receipt of funds from the Federal Government.

*Id.* at 1369. Thus the Court found that the burdens placed on the State under the AACWA were procedural, not substantive.

While the *Suter* court's approach to analyzing the AACWA is *ad hoc,* there are several guidelines at work. First, the right allegedly created by Congress must be specific and unambiguous. The statutory requirement that the State exercise "reasonable efforts," the Court ruled, was too general and ambiguous to establish a right. Finally, the Court found that the AACWA requirements were merely procedural, not substantive.

### b. *The Existing Framework as Applied to 42 U.S.C. § 5310*

Under the *Wilder* framework, the first question to be asked is whether the statutory provision was intended to benefit plaintiffs. There can be little doubt that § 5310 is intended to provide laborers with higher wages than they would receive in the absence of this section. The congressional word choice in § 5310, particularly when viewed in contrast to other statutory provisions concerning prevailing wage requirements, reflects an unambiguous focus on construction workers: *"[a]ll laborers and mechanics* employed by contractors or subcontractors in the performance of construction work financed ... with assistance received under this chapter *shall be paid wages* at rates not less than those prevailing on similar construction in the locality" (emphasis added). This can be contrasted with a provision in Title II of the HCDA, amending the United States Housing Act of 1937, which provided that,

> [a]ny *contract* ... pursuant to this chapter *shall contain a provision* requiring that ... not less than the wages prevailing in the locality, as predetermined by the Secretary of Labor pursuant to the Davis–Bacon Act, shall be provided to all laborers and mechanics employed in the development of the project involved.

42 U.S.C. § 1437j (emphasis added). The § 1437j language, with its emphasis on the contract, can properly be viewed as creating a duty on the contractor, rather than creating a right for the laborers/mechanics.

The contrast between § 1437j and § 5310 is significant. In drafting § 5310, if Congress had wished to focus on the contract itself, rather than establish a right for workers, it certainly knew how to do so. Thus the wording of § 1437j is strong evidence that Congress intended to create a right for laborers and mechanics under § 5310.

Alternatively, Congress could have focused on the government's responsibility,

as it did in 33 U.S.C. § 1372, which provides:

> The Administrator [of the Environmental Protection Agency] shall take such action as may be necessary to insure that all laborers and mechanics employed by contractors or subcontractors on treatment works for which grants are made under this chapter shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the immediate locality, as determined by the Secretary of Labor in accordance with the Davis–Bacon Act.

On the basis of this language, the Fifth Circuit, in *United States ex rel. Glynn v. Capeletti Bros., Inc.*, 621 F.2d 1309 (5th Cir.1980), concluded that Congress did not intend to confer benefits directly on laborers, but rather to impose a duty on a federal agency to insure that certain wages were paid. It is significant that § 1372 was enacted prior to the HCDA, in 1972, because this is further evidence that Congress knew how to place a burden on a federal agency, rather than confer a right on laborers/mechanics, when it chose to do so.

It is also instructive to compare the language of § 5310 to the language used in the Davis–Bacon Act itself, which, like 42 U.S.C. § 1437j, has contracts, not laborers, as its focus. That statute provides that:

> [t]he advertised specifications for every contract in excess of $2,000 to which the United States ... is a party, for construction, alteration and/or repair ... of public buildings or public works of the United States ... which requires or involves the employment of mechanic and/or laborers shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics which shall be based upon the wages that will be determined by the Secretary of Labor to be prevailing [wages].

40 U.S.C. § 276a(a).

In *Universities Research Assn. v. Coutu*, 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d

662 (1981), the Supreme Court sought to determine whether this Davis–Bacon Act provision created a right in the mechanics and laborers:

> [s]ection 1 of the Davis–Bacon Act requires that certain stipulations be placed in federal construction contracts for the benefit of mechanics and laborers, *but it does not confer rights directly on those individuals.* Since § 1 is simply 'phrased as a directive to federal agencies engaged in the disbursement of funds,' its language provides no support for the implication of a private remedy.

*Id.* at 772–73, 101 S.Ct. at 1462–63 (emphasis added) (*citing Cannon v. University of Chicago*, 441 U.S. 677, 693 n. 14, 99 S.Ct. 1946, 1955 n. 14, 60 L.Ed.2d 560 (1979)).[12]

Defendants point to *Latinos Unidos De Chelsea En Accion v. Secretary of Housing and Urban Dev.*, 799 F.2d 774, 793–95 (1st Cir.1986) to argue that the language of § 5310, when viewed in the context of the primary congressional purpose in passing Title I of the HCDA, does not create a right in laborers and mechanics. In *Latinos Unidos*, the First Circuit found that 42 U.S.C. § 5309, which prohibits discrimination on the basis of race, color, national origin, or sex in connection with programs or activities funded under Title I of the HCDA, did not create an implied private right of action. The First Circuit reasoned that the purpose of the HCDA was not the prevention of discrimination, noting that Title I of the HCDA "was passed in response to Congress' concern for the 'critical social, economic and environmental' conditions existing in the nation's cities. The statute's primary objective was 'the development of viable urban communities.'" *Id.* at 793 (quoting 42 U.S.C. §§ 5301(a) & (c)). Thus the *Latinos Unidos* court found that, because Title I was not enacted for the "especial benefit" of the minority community, 42 U.S.C. § 5309 did not create a private right of action for discrimination.

When interpreting § 5310, this Court will apply the general principle that "a statute

---

12. Although the *Coutu* court's inquiry concerned the alleged existence of an implied private right of action, rather than a § 1983 right of action, the analysis as to whether there is a *right* created by a statutory provision is the same for each inquiry.

should be read according to its literal terms, unless this produces an interpretation which makes little sense, does violence to the purposes Congress sought to serve by the statute, or is otherwise 'demonstrably at odds with the intentions of the statute's drafters.'" *Metropolitan Transp. Auth. v. F.E.R.C.*, 796 F.2d 584, 591 (2d Cir.1986) (citations omitted), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1286, 94 L.Ed.2d 144 (1987).

With this principle in mind, this Court concludes that finding a right for laborers and mechanics under § 5310 is entirely consistent with the overall congressional purpose in enacting Title I of the HCDA. Congress stated that "[t]he primary objective of [Title I of the HCDA] is the development of viable urban communities, by providing decent housing and a suitable living environment and *expanding economic opportunities, principally for persons of low and moderate income.*" 42 U.S.C. § 5301(c) (emphasis added). Thus, the instant case is distinguishable from *Latinos.* There can be little doubt that, if CPC had paid the prevailing wage, rather than the substantially lower wage actually paid to plaintiffs, this would have provided expanded economic opportunities for persons of low or moderate income, namely plaintiffs.[13]

■ The Court must next ask whether § 5310 contains merely a "congressional preference" for a certain kind of conduct rather than a binding obligation on the governmental unit. The language of § 5310 indicates that Congress sought to create a binding obligation on the governmental unit. In particular, § 5310 provides that employees on construction projects financed under Title I of the HCDA *"shall"*

be paid at least prevailing wages, as determined by the Secretary of Labor. As discussed above, had Congress wished to create a procedural requirement that contracts contain certain terms, rather than a binding obligation toward laborers and mechanics, they could have done so, using language such as was in 42 U.S.C. § 1437j.

■ Furthermore, in applying the third part of the *Wilder* test, the interest that the plaintiffs assert is not "too vague and amorphous such that it is beyond the competence of the judiciary to enforce." Pursuant to § 5310, the Secretary of Labor is required to establish, with great specificity, prevailing wage rates to be paid laborers and mechanics.

■ Under the *Suter* court's guidelines, § 5310 also creates a § 1983 right of action. First, unlike the "reasonable efforts" clause of the AACWA, the right to prevailing wages under § 5310 (as determined by the Secretary of Labor) creates an unambiguous, specific benchmark. The contractor knows exactly what wage rates will need to be paid and, as discussed *supra,* rights are unambiguously conferred on laborers and mechanics. Finally, because the "shall" requirement of § 5310 is directed at the payment of workers' wages, rather than compelling the inclusion of a contract provision (as in 42 U.S.C. § 1437j), the requirement is substantive, not procedural. For these reasons, this Court finds that 42 U.S.C. § 5310 unambiguously conferred a specific substantive right on plaintiffs under the *Suter* standards.

3. Did Congress Foreclose § 1983 Enforcement of § 5310?

a. *The Existing Framework*

■ The general rule that a violation of federal law creates a § 1983 right of action

---

**13.** Economists and other public policy makers debate the value to those of low and moderate incomes of having a wage floor, either in the form of a federal minimum wage or a prevailing wage. While a wage floor increases the welfare of those who are hired, it is arguable that, if there were no prevailing wage requirement, social utility would be increased because contractors would be able to hire more workers on a fixed labor budget. It is, however, not the function of the courts to resolve this policy debate. It is enough for the Court to find that

Congress could have believed that a prevailing wage provision would serve the purpose of "expanding economic opportunities, principally for persons of low and moderate income." Although there is nothing in the statute itself or its legislative history which explicitly establishes that Congress had this causal link in mind when it enacted Title I of the HCDA, the fact that Congress included § 5310 in this title is sufficient to establish that Congress thought § 5310 would, at a minimum, not be inconsistent with the purposes of Title I.

has a second exception: when Congress has foreclosed § 1983 enforcement of a given statute in that statute itself. However, a court should not " 'lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right.' " *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. at 520, 110 S.Ct. at 2523 (quoting *Wright v. Roanoke Redevelopment & Housing Auth.*, 479 U.S. at 423–24, 107 S.Ct. at 770–71 (quoting *Smith v. Robinson*, 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984))).

Thus, there is a heavy burden on a defendant to demonstrate that Congress intended to foreclose a § 1983 remedy. As the *Wilder* court wrote, in rejecting the government's argument that Congress foreclosed enforcement of the Medicaid Act under § 1983:

> [t]he burden is on the State to show "by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." *Wright*, 479 U.S. at 423, 107 S.Ct. at 770.... In the absence of such an express provision, we have found private enforcement foreclosed only when the statute itself creates a remedial scheme that is "sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex County Sewerage Auth. v. National Sea Clammers Assn.*, 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981).

*Wilder v. Virginia Hospital Ass'n*, 496 U.S. at 520–21, 110 S.Ct. at 2523. Furthermore, "[t]he availability of administrative mechanisms to protect plaintiff's interests is not necessarily sufficient to demonstrate that Congress intended to foreclose a § 1983 remedy. Rather the statutory framework must be such that 'allowing a plaintiff' to bring a § 1983 action 'would be inconsistent with Congress' carefully tailored scheme.' " *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. at 106–07, 110 S.Ct. at 448–49 (citations omitted).

The "sufficiently comprehensive" test is rarely met. As the *Wilder* court noted,

[o]n only two occasions have we found a remedial scheme established by Congress sufficient to displace the remedy provided in § 1983. In *Sea Clammers*, we held that the comprehensive enforcement scheme found in the Federal Water Pollution Control Act—which granted the Environmental Protection Agency considerable enforcement power through the use of noncompliance orders, civil suits and criminal penalties, and which included two citizen suit provisions—evidenced a congressional intent to foreclose reliance on § 1983.... Similarly, in *Smith v. Robinson*, we held that the elaborate administrative scheme set forth in the Education of the Handicapped Act manifested Congress' desire to foreclose private reliance on § 1983 as a remedy. The EHA contained a 'carefully tailored administrative and judicial mechanism' that included local administrative review and culminated in a right to judicial review.

*Wilder v. Virginia Hospital Ass'n*, 496 U.S. at 521, 110 S.Ct. at 2523–24 (citations omitted).

The *Wilder* court concluded that the administrative scheme established pursuant to the Boren Amendment to the Medicaid Act could not be considered sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983, noting that, "[i]n *Wright*, we concluded that the 'generalized powers' of HUD to audit and cut off federal funds were insufficient to foreclose reliance on § 1983 to vindicate federal rights. We noted that HUD did not exercise its auditing power frequently and the statute did not require, nor did HUD provide, any mechanism for individuals to bring problems to the attention of HUD." *Wilder v. Virginia Hospital Assn.*, 496 U.S. at 522, 110 S.Ct. at 2524.

This Court must now determine whether the administrative enforcement scheme of § 5310 is "sufficiently comprehensive", such that allowing a § 1983 action would be inconsistent with Congress' carefully tailored enforcement scheme.[14]

---

**14.** In dicta, the *Suter* court determined that oth-

er sections of the AACWA provide enforcement

### b. The Existing Framework as Applied to 42 U.S.C. § 5310

■ Nowhere in the HCDA did Congress explicitly foreclose § 1983 enforcement of § 5310. The Court will therefore seek to determine whether Congress implicitly foreclosed § 1983 enforcement of § 5310.

As an initial matter, it is helpful to view § 5310 as establishing two mechanisms in the context of Title I of the HCDA: (1) the *predetermination* of a prevailing wage and (2) the *enforcement* of a contractor's obligation to pay that wage. While it may be that allowing a § 1983 right of action to challenge the Secretary's *predetermination* of a prevailing wage rate would upset Congress' carefully tailored scheme in enacting § 5310,[15] the same cannot be said of a § 1983 right of action seeking to *enforce* a contractor's obligation to pay the predetermined wage.

In analyzing the Davis–Bacon Act, as amended, the Supreme Court found that it represented a balancing between the interests of laborers and of contractors. The contractor's interest lies in being able to "know definitely in advance of submitting his bid what his approximate labor costs will be," while the laborers' interest lies in protecting local wage standards. *Universities Research Assn. v. Coutu*, 450 U.S. at 773, 775, 782, 101 S.Ct. at 1462, 1463, 1467. There is no reason to believe that the interests Congress sought to balance in enacting § 5310 are any different.

In the instant case, the *predetermination* of prevailing wage rates by the Secretary of Labor provided CPC with certainty when preparing its bid. Plaintiffs do not challenge the Secretary's determination in this regard. Any private *enforcement*, pursuant to § 1983, of the contractor's obligation to pay would not upset the contractor's interest in having a predetermined wage rate to factor into a bid. Thus a private right of action pursuant to § 1983 does not upset the balance of Congress' "carefully tailored scheme" that is at the heart of § 5310.

Defendants point to the finding of the Supreme Court in *Universities Research Assn. v. Coutu*, 450 U.S. at 783, 101 S.Ct. at 1467, that, "[t]he implication of a private right of action here would undercut as well the elaborate administrative scheme promulgated pursuant to Reorganization Plan No. 14." The issue in *Coutu*, however, was whether the Davis–Bacon Act conferred a private right of action on an employee under a contract that had been predetermined by the Secretary of Labor *not* to call for Davis–Bacon work. Thus the employee in *Coutu* was challenging a *predetermination* ruling by the Secretary of Labor concerning whether a contract is covered by Davis–Bacon. If contractors had to worry that such predetermination rulings might be upset in judicial postcontract coverage rulings, the benefit of a predetermination ruling would be largely lost, i.e., contractors would not be able to accurately forecast their labor costs. It

mechanisms for the "reasonable efforts" clause of the Act, and suggested that even a *non-comprehensive* statutory enforcement scheme might preclude a § 1983 right of action: "[w]hile the [AACWA's] statutory provisions may not provide a comprehensive enforcement mechanism so as to manifest Congress' intent to foreclose remedies under § 1983, they do show that the absence of a remedy to private plaintiffs under § 1983 does not make the reasonable efforts clause a dead letter." *Suter v. Artist M.*, 112 S.Ct. at 1368–69. *See also, id.* at 1377 (Blackmun, J., dissenting) ("[the Court] has contravened 22 years of precedent by suggesting that the existence of other 'enforcement mechanisms' precludes § 1983 enforcement"). However, because the *Suter* court found that the AACWA did not create an enforceable right, the Court did

not reach the issue of whether a statutory enforcement scheme that could be characterized as non-comprehensive would preclude a right of action under § 1983. *Id.* at 1368 n. 11. Therefore this Court will continue to follow the precedent of *Wilder* and its predecessors in finding that only a "comprehensive" statutory scheme will preclude a § 1983 right of action.

**15.** Because this issue is not before the Court in the instant action, it is not necessary to decide that matter. However, under the Davis–Bacon Act, the correctness of the Secretary's wage rate determination is not subject to judicial review. *Universities Research Assn. v. Coutu*, 450 U.S. at 761 n. 10, 101 S.Ct. at 1456 n. 10 (citing *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 177, 74 S.Ct. 438, 441, 98 L.Ed. 594 (1954)).

was this need for consistency, in determining which contracts are covered under Davis–Bacon and which are not, that the *Coutu* court had in mind·when it concluded that, "[w]hatever may be the merits of allowing judicial review of these complex coverage determinations prior to contracting, it clearly would be inappropriate for a court to substitute its judgment for that of a contracting agency in a private action brought after the contract was let." *Id.* at .784. This conclusion is not, however, applicable in a situation, such as is presented in the instant case, where coverage is not in dispute and employees merely seek to *enforce* that which was already predetermined: that § 5310 applies to the contract.

Defendants assert that allowing a § 1983 right of action would contravene the purpose of the Reorganization Plan, as incorporated into § 5310, which is to "assure coordination of administration and *consistency of enforcement* of the labor standards." (emphasis added) However, as the President's transmittal message makes clear, this "consistency of enforcement" refers to a consistent approach to enforcement across government agencies, and thus would not preclude private enforcement:

> the Federal agencies involved in the administration of the various acts [including the Davis–Bacon Act] are divided into two classes: (1) agencies which contract for Federal public works or construction; and (2) agencies which lend or grant Federal funds ... to aid in the construction of projects to be built by State or local public agencies or private individuals and groups. The methods of enforcing labor standards necessarily differ between these two groups of agencies.
>
> *The methods adopted by the various agencies for the enforcement of labor standards vary widely in character and effectiveness. As a result, uniformity of enforcement is lacking and the de-gree of protection afforded workers varies from agency to agency.*
>
> In order to correct this situation, this plan authorizes the Secretary of Labor to coordinate the administration of legislation relating to wages and hours on federally financed or assisted projects by prescribing standards, regulations and procedures to govern the enforcement activities of the various federal agencies and by making such investigations as he deems desirable to assure consistent enforcement.

Reorganization Plan Number· 14 of 1950, Message of the President, 5 U.S.C.App. (emphasis added). Thus, the Reorganization Plan was designed to remedy inconsistent application of federal labor standards by *federal administrative agencies.* This congressional and presidential interest in a uniform approach to enforcement by federal agencies would not be undermined by a § 1983 right of action. Certainly there is no evidence that Congress or the President even considered private enforcement when they placed the "consistency of enforcement" language in the Reorganization Plan.

Furthermore, it cannot be said that the administrative enforcement scheme established pursuant to § 5310 is "sufficiently comprehensive" to preclude a § 1983 right of action. Unlike the comprehensive enforcement schemes in *Sea Clammers* and *Smith v. Robinson,* neither § 5310 nor the Reorganization Plan contain provisions for private judicial remedies. The federal regulation which establishes a procedure for the resolution of disputes concerning payment of wages under the Reorganization Plan, 29 C.F.R. § 5.11(a), does not allow an employee to initiate such a procedure.[16] Only *after* a ruling on a wage dispute by the Administrator of the Department of Labor's Wage and Hour Division or an ALJ does an employee have an opportunity to initiate an action: he or she may appeal the ruling to the Wage Appeals Board, pursu-

---

**16.** 29 C.F.R. § 5.11(a) provides that:
This section sets forth the procedure for resolution of disputes of fact or law concerning payment of prevailing wage rates, overtime pay or proper classification. *The procedures* *in this section may be initiated upon the Administrator's own motion, upon referral of the dispute by a Federal agency ...,, or upon re-.quest of the contractor or subcontractor(s).* (emphasis added).

ant to 29 C.F.R. § 7.1 *et seq.* There is, however, no right to judicial review of the Wage Appeals Board decision, except for procedural appeals under the Administrative Procedure Act. Although these opportunities for employees to enforce wage determinations are significant, they do not rise to the level of being "sufficiently comprehensive."

Finally, defendants' well-researched history of the Davis–Bacon Act and the various congressional efforts to amend the Davis–Bacon Act, in order to explicitly provide private judicial remedies, does not persuade the Court that Congress intended to preclude § 1983 actions under § 5310. Although the congressional reasons for enacting § 5310 undoubtedly mirror, in large part, the rationale behind the Davis–Bacon Act, as amended, it is important to keep in mind that there are fundamental differences between the two laws. Of greatest significance, the Davis–Bacon Act regulates contracts to which the federal government is a party and therefore there can be no § 1983 *state* action remedy. Thus, on the numerous occasions when Congress considered, and ultimately rejected, the creation of a private right of action under the Davis–Bacon Act, Congress could not have had in mind the preclusion of a § 1983 remedy, as no such remedy was then (or is now) available under the Davis–Bacon Act. Section 5310, in contrast, regulates contracts between a state or local government unit and a contractor, and thus there may be state action for purposes of a § 1983 action. For this reason, the legislative history of the Davis–Bacon Act cannot be seen as demonstrating congressional intent to preclude a § 1983 remedy under § 5310. Finally, there is absolutely no evidence in the legislative history of the HCDA itself that Congress sought to foreclose a § 1983 remedy under § 5310.

Defendants have not demonstrated that: (a) the § 5310 administrative enforcement scheme is sufficiently comprehensive; (b) a § 1983 remedy would skew a carefully tailored enforcement scheme; or (c) there is any evidence in the text or legislative history of the HCDA of congressional intent to preclude a § 1983 action under § 5310.

For these reasons, this Court finds that defendants have not met their heavy burden of proving that Congress intended to foreclose § 1983 enforcement of § 5310.

D. *Plaintiffs' Implied Private Right of Action Claim*

1. The Existing Framework

"[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1952, 60 L.Ed.2d 560 (1979). Rather courts must determine whether a federal statute creates an implied private right of action by applying the four-factor analysis of *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which asks: (1) is plaintiff one of the class for whose especial benefit the statute was created?; (2) is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?; (3) is it consistent with the underlying purposes of the legislative scheme to imply such remedy?; and (4) is the cause of action one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law?

The implied private right of action analysis under *Cort,* although related, is distinctly different from the § 1983 analysis discussed *supra.* As the Supreme Court recently wrote:

The [four factored *Cort*] test reflects a concern, grounded in separation of powers, that Congress rather than the courts controls the availability of remedies for violations of statutes. Because § 1983 provides an "alternative source of express congressional authorization of private suits," these separation of powers concerns are not present in a § 1983 case. Consistent with this view, we recognize an exception to the general rule that § 1983 provides a remedy for violation of federal statutory rights only when Congress has affirmatively withdrawn the remedy.

*Wilder v. Virginia Hospital Association,* 496 U.S. at 508, n. 9, 110 S.Ct. at 2517, n. 9 (citations omitted).

 While courts continue to apply *Cort*'s four factors, it is the second factor, legislative intent, that is the primary focus in determining whether there is an implied private right of action.[17] *Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979); *Saltzman v. Farm Credit Services,* 950 F.2d 466, 467–68 (7th Cir.1991). Legislative intent may be found in the language or structure of the statute or in some other source. *Thompson v. Thompson,* 484 U.S. at 179, 108 S.Ct. at 516 (citing *Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981)). This inquiry requires "a very close, even microscopic, examination of the legislative history of the particular statute involved." *Davis v. United Air Lines,* 662 F.2d 120, 123 (2d Cir.1981), *cert. denied,* 456 U.S. 965, 102 S.Ct. 2045, 72 L.Ed.2d 490 (1982).

A party may show legislative intent without having to demonstrate that Congress simply forgot to create a private right of action:

[o]ur focus on congressional intent does not mean that we require evidence that Members of Congress, in enacting the statute, actually had in mind the creation of a private cause of action. The implied cause of action doctrine would be a virtual dead letter were it limited to correcting drafting errors when Congress simply forgot to codify its evident intention to provide a cause of action. Rather, as an *implied* cause of action doctrine suggests, "the legislative history of a statute that does not expressly create or

deny a private remedy will typically be equally silent or ambiguous on the question." We therefore have recognized that Congress' "intent may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment."

*Thompson v. Thompson,* 484 U.S. at 179, 108 S.Ct. at 516 (citations omitted) (emphasis in original).

Courts should generally not find an implied private right of action in a given statute when Congress has expressly provided a different remedy. *Karahalios v. National Federation of Federal Employees, Local 1263,* 489 U.S. 527, 533, 109 S.Ct. 1282, 1287, 103 L.Ed.2d 539 (1989) ("It is ... an "elemental canon" of statutory construction that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies. In such cases, 'in the absence of strong indicia of contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.' " (quoting *Middlesex County Sewerage Authority v. Sea Clammers,* 453 U.S. 1, 15, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981) (other citations omitted)). However, "[t]he fact that other provisions of a complex statutory scheme create express remedies has not been accepted as a sufficient reason for refusing to imply an otherwise appropriate remedy under a separate section." *Cannon v. University of Chicago,* 441 U.S. 677, 711, 99 S.Ct. 1946, 1965, 60 L.Ed.2d 560 (1979).

2. The Existing Framework as Applied to 42 U.S.C. § 5310

 In determining whether § 5310 creates an implied private right of action, it is the second *Cort* factor, legislative intent, which will be this Court's primary focus.[18] As discussed above, courts generally

---

17. Justice Scalia argues that the Supreme Court has "effectively overruled" the four-factor *Cort* analysis in *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89 (1979) and in *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979), thereby converting *Cort's* second factor (i.e. congressional intent) into *"the determinative factor"*, with the other three

merely indicative of the presence or absence of such intent. *Thompson v. Thompson,* 484 U.S. 174, 188–89, 108 S.Ct. 513, 520–21 (1988) (Scalia, J., concurring) (emphasis in original).

18. For the reasons stated in Section C.2.b., *supra,* the Court finds that plaintiffs were one of the class for whose especial benefit § 5310 was

should not find an implied private right of action in a given statute when Congress has expressly provided a different remedy in that same part of the statute. *Karahalios v. National Federation of Federal Employees, Local 1263*, 489 U.S. at 533, 109 S.Ct. at 1287. Thus, while there is "an exception to the general rule that § 1983 provides a remedy for violation of federal statutory rights only when Congress has affirmatively withdrawn the remedy," *Wilder v. Virginia Hospital Association*, 496 U.S. at 508, n. 9, 110 S.Ct. at 2517 n. 9, the presumption in implied private right of action lawsuits is drawn in precisely the opposite direction: when Congress has expressly provided other remedies in connection with a particular section of a statute, no other remedies are to be implied "in the absence of strong indicia on contrary congressional intent." *Karahalios v. National Federation of Federal Employees, Local 1263*, 489 U.S. at 533, 109 S.Ct. at 1287.

■■■ Congress has already created other tools for enforcement of § 5310. The Reorganization Plan provides for an administrative enforcement mechanism. This Court has found that laborers and mechanics have a § 1983 right of action. Because Congress has created these remedies and there is no strong indication that Congress intended to create additional remedies, this Court finds that no implied private right of action exists under § 5310.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss pursuant to Rule

created. Thus, the first prong of the *Cort* test favors plaintiffs in the instant action.

19. Municipal defendants paint a doomsday scenario if their motion is not granted and this Court finds a § 1983 remedy, asserting that this would "generate thousands of new cases for the already overburdened federal courts," that "[p]ublic contracting where Davis–Bacon was applicable would likely become impossible," and that "many municipalities would decline to accept HCDA money and, thus, ... the purposes for which HCDA was designed would no longer be served." Memorandum of Law in Support of Municipal Defendant's Motion to Dismiss the Complaint at 122–23. While municipal defendants' dire predictions may or may not prove to be correct, it is not the function of this Court to play prognosticator, nor to deny a meritorious

12(b)(6), Fed.R.Civ.P., are denied with respect to plaintiff's claims brought under 42 U.S.C. § 1983 and granted with respect to those claims brought pursuant to an asserted implied private right of action under 42 U.S.C. § 5310. In addition, that part of municipal defendants' motion brought pursuant to Rule 12(b)(1), Fed.R.Civ.P. is denied.[19] The magistrate judge's findings and recommendations are modified in accordance with this opinion.

Inasmuch as the Court declines the municipal defendants' request to certify this case for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), the parties are directed to complete discovery by August 28, 1992 and to file a joint pre-trial order by September 25, 1992.

It is so ordered.

## OPINION ON MOTION TO MODIFY

Defendants City of New York ("the City") and the Department of Housing Preservation and Development of the City of New York (collectively "municipal defendants") and Chinese–American Planning Counsel, Inc. ("CPC") have each moved, pursuant to Local Civil Rule 3(j), USDC, SDNY, for reargument of that portion of this Court's Opinion and Order dated June 5, 1992 (the "June 5, 1992 Opinion and Order") in which the Court "decline[d] the municipal defendants' request to certify this case for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b)". Kam Shing

claim because it might invite other claims which would place a potentially heavy financial burden on municipalities. As discussed above, the Court finds that the elements necessary to establish a § 1983 right of action are present in § 5310. Furthermore, this decision relies on the specific language of § 5310, which differs, in important respects, from the language of the Davis–Bacon Act, as well as many of the other statutory provisions that refer to the wage-setting standards of the Davis–Bacon Act, such as 42 U.S.C. § 1437j and 33 U.S.C. § 1372. Thus this opinion is quite limited in its scope. Certainly if municipal defendants' parade of horribles does come to pass, Congress is free to prohibit a § 1983 right of action under § 5310 or any other statute.

Chan and the other plaintiffs (collectively "plaintiffs") oppose the instant motions. For the reasons that follow, the Court: (1) deems defendants' motions for reargument to be motions to modify the June 5, 1992 Opinion and Order; and (2) grants these motions, thereby certifying this case for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). In all other respects, the Court adheres to its June 5, 1992 Opinion and Order.

## BACKGROUND

The relevant background to the underlying action is contained in the June 5, 1992 Opinion and Order at 715–716.

On June 3, 1992, approximately one month after oral argument on defendants' motions to dismiss and two days before the Court issued its opinion on those motions, municipal defendants submitted a short letter, containing little supporting authority, to the Court seeking certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Prior to issuance of the June 5, 1992 Opinion and Order, no other party made any submissions on this subject to the Court. In its June 5, 1992 Opinion and Order, this Court declined to certify the case for interlocutory appeal, and the instant motions followed.

## DISCUSSION

### A. *Defendants' Motions for Reargument*

A party may move for reargument pursuant to Local Civil Rule 3(j) only upon an assertion that "the court has overlooked 'matters or controlling decisions' which, had they been considered, might reasonably have altered the result reached by the court." *Adams v. United States*, 686 F.Supp. 417, 418 (S.D.N.Y.1988) (quoting Local Civil Rule 3(j), USDC, SDNY), *quoted in Schonberger v. Serchuk*, 742 F.Supp. 108, 119 (S.D.N.Y.1990).

In addition, "a party making a motion for reargument may not, under [Local] Civil Rule 3(j), advance new facts, issues or arguments not previously presented to the Court." *Schonberger v. Serchuk*, 742 F.Supp. at 119.

In light of the fact that neither CPC nor plaintiffs briefed the § 1292(b) certification issue prior to issuance of the June 5, 1992 Opinion and Order, and that municipal defendants' letter seeking certification cited little authority in support of municipal defendants' position, it is clear that, in the context of the instant motions for reargument, each of which presents a great deal of supporting authority, all parties are "advanc[ing] new facts, issues or arguments not previously presented to the Court." Accordingly, this Court would be compelled to deny defendants' motions for reargument pursuant to Local Civil Rule 3(j).

 However, because the issues concerning § 1292(b) certification have only now been fully briefed, in the context of defendants' motions for reargument, it is appropriate to treat these issues as before the Court for the first time. For this reason, the Court deems the instant motions to be motions to modify the June 5, 1992 Opinion and Order. Accordingly, the Court now turns to the merits of the parties' arguments.

### B. *Certification of an Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b)*

 Defendants seek an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), which provides, in relevant part, that

[w]hen a district judge, in making in a civil action an order not otherwise appealable under [section 1292], shall be of the opinion that such order [(1)] *involves a controlling question of law* [(2)] as to which there is *substantial ground for difference of opinion* and that [(3)] *an immediate appeal from the order may materially advance the ultimate termination of the litigation,* he shall so state in writing in such order. The Court of Appeals ... may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order.

(emphasis added). The Second Circuit recently has "urge[d] the district courts to exercise great care in making a § 1292(b) certification[, because] the district courts

are presumed to be more familiar with a case than is the court of appeals prior to briefing and argument." *Westwood Pharmaceuticals Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 964 F.2d 85, 89 (2d Cir.1992). Furthermore, only "exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475, 98 S.Ct. 2454, 2461, 57 L.Ed.2d 351 (1978), *quoted in Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990). With these general admonitions in mind, the Court now turns to the three-pronged test of § 1292(b) to ascertain whether the exceptional circumstances of this case suggest that certification is appropriate.

### 1. Is there a Controlling Question of Law?

There can be little doubt that the issues defendants seek to appeal, concerning whether plaintiffs have a right of action pursuant to 42 U.S.C. § 1983, "importantly affect the conduct of [this] action," *see In re Duplan Corp.*, 591 F.2d 139, 148 n. 11 (2d Cir.1978) and the sources cited therein. As defendants have correctly noted, if the Court of Appeals determines that plaintiffs have no § 1983 right of action, this Court *may* be compelled to dismiss plaintiff's other claims as well, either under a theory of preemption or because the only remaining claims would be pendent state claims. Thus, a ruling by the Court of Appeals in favor of defendants *could* result in dismissal of this lawsuit.

■ Plaintiffs assert that the precedential value of the June 5, 1992 Opinion and Order and any appellate review will be limited. The Court agrees with plaintiffs on this point. *See* June 5, 1992 Opinion and Order at 731 n. 19. However, it is not necessary for the resolution of a question to be of great precedential value in order for that question to be "controlling." *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d at 24.

For these reasons, the Court finds that its June 5, 1992 Opinion and Order does involve a controlling question of law.

### 2. Is there a Substantial Ground for Difference of Opinion?

The issues addressed in the June 5, 1992 Opinion and Order involved matters that were both difficult and of first impression. *See Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d at 25 (noting with approval the district court's conclusion that, when the issues before the district court on a motion for certification pursuant to 28 U.S.C. § 1292(b) were "difficult and of first impression," there were "substantial grounds for difference of opinion"). Although this Court found that there is a § 1983 right of action under 42 U.S.C. § 5310, the conclusions reached by the Court were by no means the only reasonable conclusions an impartial arbiter could reach. The Court was presented with two close questions concerning whether Congress intended to (1) create a "right" under § 5310 and (2) foreclose § 1983 enforcement of § 5310. The Court obviously believes it answered these questions correctly. However, primarily because there was no explicit indication in the text of § 5310 or in its legislative history to guide an arbiter in answering these questions, the Court cannot say that there is no "substantial ground for difference of opinion." Accordingly, defendants have met the second prong of the § 1292(b) test.

### 3. Might an Immediate Appeal from the Order Materially Advance the Ultimate Termination of the Litigation?

If defendants are successful on appeal and the Second Circuit dismisses the § 1983 claims, there is a substantial likelihood that the amount of discovery and corresponding district court time will be reduced dramatically, perhaps even entirely. Given the number of plaintiffs already involved in this litigation, and their pending motion for class certification, there is a significant amount of discovery to be conducted simply to determine the extent of each plaintiff's participation in CPC's training programs. The fact that plaintiffs seek class certification and that certain aspects

of discovery involve translations from Chinese to English adds an additional level of complexity to this action. For these reasons, a successful appeal by defendants would materially advance the ultimate termination of the litigation and would, in all likelihood, preserve scarce resources of the parties and the judiciary.

## CONCLUSION

Defendants' motions for reargument pursuant to Local Civil Rule 3(j), USDC, SDNY are deemed by this Court to be motions to modify the June 5, 1992 Opinion and Order. For the reasons stated *supra*, this Court finds that the June 5, 1992 Opinion and Order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the opinion and order may materially advance the ultimate termination of the instant litigation. Except to the extent indicated above, nothing in this opinion and order shall be construed to modify the June 5, 1992 Opinion and Order.

It is so ordered.