Kam Shing CHAN, Kam Tai Chan, Jing Yi Chen, Shan Non Chiu, Bak Lok Chu, Kok Kun Chu, Israel Gonzalez, Sui Bin Huang, Jian Ning Jiang, Kam Fai Kwok, Moon Shuen Kwong, Wei Xiang Lee, Yang I Lee, Young Shi Lee, Bing Zhao Li, Hao Hui Li, Kei Man Li, Wai Tai Li, Chi Kwong Liu, Jack Ye Louie, Sheng Hua Lu, Tian Guang Mai, Cheuk Mink Ng, Kin Chung Ng, Kin Hin Ng, Shun Gao Shen, Ten Jen Shen, Hau Wing Sin, Vein Dinh Sintruong, Wing Shing Tse, Wai Man Wan, Kong Htyan Wu, Xu Ming Wu, Guo Xuan and Yue Nam Zhu, Plaintiffs–Appellees–Cross–Appellants,

v.

CITY OF NEW YORK, Department of Housing Preservation & Development of New York City and Chinese–American Planning Council, Inc., Defendants–Appellants–Cross–Appellees.

Nos. 1230, 1231, 2194, Dockets 92–9236, 92–9238 and 93–7038.

United States Court of Appeals, Second Circuit.

Argued March 8, 1993.

Decided July 26, 1993.

James Reif, New York City (Ellen Dichner, Gladstein, Reif & Meginniss, Shneyer & Shen, Asian American Legal Defense & Educ. Fund, on the brief), for plaintiffs-appellees-cross-appellants.

Fay Ng, New York City (O. Peter Sherwood, Corp. Counsel, City of New York, Pamela Seider Dolgow, John P. Woods, Goodwin E. Benjamin, on the brief), for defendants-appellants City of New York and Department of Housing Preservation & Development of New York City.

Peter A. Walker, New York City (Jay W. Waks, Brian G. Cesaratto, Kaye, Scholer, Fierman, Hays & Handler, on the brief), for defendant-appellant Chinese–American Planning Council, Inc.

Before: KEARSE and CARDAMONE, Circuit Judges, and BURNS, District Judge *.

KEARSE, Circuit Judge:

Defendants City of New York ("City"), Department of Housing Preservation & Development of New York City ("HPD") (collectively "municipal defendants"), and the Chinese–American Planning Council, Inc.

---

* Honorable Ellen Bree Burns, of the United States District Court for the District of Connecticut, sitting by designation.

("CPC"), appeal from so much of an order of the United States District Court for the Southern District of New York, Robert J. Ward, *Judge,* as denied their motions pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss claims of plaintiffs Kam Shing Chan *et al.,* asserted under 42 U.S.C. § 1983 (1988) for payment of subminimum wages, in violation of § 5310 of the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et seq.* (1988 & Supp. II 1990) ("HCDA" or the "Act"). The district court ruled that although there is no private right of action directly under § 5310, plaintiffs' claims for violation of that section could be pursued under § 1983. On appeal, defendants contend principally (a) that § 5310 does not create a right that can be enforced under § 1983, and (b) that a § 1983 action cannot be maintained because CPC cannot be considered a state actor. Plaintiffs cross-appeal, challenging the district court's ruling that § 5310 affords them no private right of action directly under that section. For the reasons below, we reject these challenges and affirm in all respects.

## I. BACKGROUND

Plaintiffs were employees of CPC who worked on federally funded construction projects. The present controversy arises out of their claims that CPC paid them less than the minimum wage rates federally required for such projects. For purposes of both the appeal and the cross-appeal, we accept as true the allegations of the First Amended Verified Complaint ("Complaint"), as clarified by the actual terms of the contracts invoked by the Complaint and presented to the district court, *see Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

### A. The Contracts Between CPC and HPD

From 1986 to 1989, CPC was party to a series of three contracts with HPD for the construction, repair, and rehabilitation of certain housing owned by the City (collectively

the "Contracts"). The Contracts were funded in whole or in part by federal grants under the HCDA. Section 5310 of that Act provides generally that laborers employed on construction work financed in whole or in part by HCDA grants "shall be paid wages at rates not less than those prevailing on similar construction in the locality" as determined by the Secretary of Labor (hereinafter "federally recognized prevailing rates") in accordance with the Davis–Bacon Act, 40 U.S.C. §§ 276a to 276a–5 (1988) ("Davis–Bacon"). *See* 42 U.S.C. § 5310.

The Contracts between CPC and HPD contained certain terms and conditions required by the HCDA. One such provision, entitled "Federal Supplemental Terms and Conditions," stated that

[t]he Contractor acknowledges that this Agreement is funded under a program providing direct financial assistance from the Federal government to the City and HPD and is subject to, and the Contractor shall comply with, the requirements of all applicable Federal Statutes, rules and regulations, including, but not limited to, those set forth in Exhibit F attached to this Agreement.

(1986–87 Contract, Article 18, ¶ 18.1.) Exhibit F specified that the Contracts were subject to the conditions of, *inter alia,* the HCDA and Davis–Bacon:

The Davis–Bacon Act: In construction contracts involving an excess of $2000, unless exclusively in connection with the rehabilitation of a structure designed for residential use by less than 8 families, all laborers and mechanics must be payed at a rate not less than those determined by the Secretary of Labor to be prevailing for the locality, which rates are annexed hereto as Exhibit A. These wage rates are a federally mandated *minimum*. . . .

(1986–87 Contract, Exhibit F, Article 3(b)(i) (emphasis in original).)

Each Contract was awarded following the submission of bids in response to HPD's Requests for Proposals ("RFPs"). The RFPs, which were incorporated in the Contracts, contained express provisions with respect to the wages to be paid workers on projects covered by the Contracts. For ex-

ample, the RFP for the 1986–87 Contract stated:

A Person–Day Rate, which shall be all inclusive of costs within each Proposal, will be the proper method of establishing the overall budget. For example, if $75.00 is the Person–Day Rate, all costs to run the program, pay the staff and trainees and provide training equipment and administrative services would be covered by said rate multiplied by the number of trainees multiplied by the number of days worked.

(1986–87 RFP General Guidelines ¶ 1 (emphasis omitted).) This RFP also provided that "[t]here shall be 246 work days in the term of the Contract" (*id.* ¶ 6 (emphasis omitted)), and that "[a] maximum Person–Day Rate is being set at $90.00" (*id.* ¶ 2). The Contract prohibited CPC from receiving any additional funding for "Program Work performed pursuant to this Agreement." (1986–87 Contract, Article 15, ¶ 15.2.)

CPC bid for and won the 1986–87 Contract with a budget that called for 30 trainees working 246 days at the $90 Person–Day Rate. The total contract price was thus $664,200. The 1988 and 1989 Contracts awarded to CPC were similar, though the RFPs permitted, and the Contracts called for, Person–Day Rates of $95.

## B. *The Present Lawsuit and the District Court's Decision*

In 1990, plaintiffs commenced the present action, alleging that they were CPC employees who had performed construction, repair, or rehabilitation work on the projects covered by these Contracts and that from September 1986 to December 1989, (1) the wage rates specified in the Contracts were lower than the then-current federally recognized prevailing rates, and (2) CPC paid plaintiffs at rates even lower than those specified in the Contracts. The Complaint alleged that HPD "knowingly consented to, condoned, authorized, acquiesced in, and acted with deliberate indifference to, the repeated failures and refusals of CPC to pay plaintiffs at the federally mandated prevailing wage rates." (Complaint ¶ 53.) Plaintiffs contended principally that CPC in failing to pay federally

recognized prevailing rates, and HPD in consenting, condoning, and authorizing that failure, deprived plaintiffs of their rights under § 5310, in violation of § 1983. As damages, plaintiffs requested, *inter alia,* the difference between the federally mandated wages and the wages they actually received.

Defendants moved pursuant to, *inter alia,* Fed.R.Civ.P. 12(b)(6) to dismiss plaintiffs' federal claims on the grounds that (1) no implied private right of action exists under § 5310, (2) the HCDA did not create a right that is enforceable under § 1983, and (3) in any event, the Complaint did not sufficiently allege that CPC acted under color of state law within the meaning of § 1983. In an opinion reported at 803 F.Supp. 710 (1992), the district court dismissed plaintiffs' claims to the extent that they were asserted directly under § 5310 but denied defendants' motions to dismiss to the extent that the claims were asserted under § 1983.

In determining that § 5310 itself did not grant plaintiffs a private right of action, the district court principally applied the analysis set out in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Noting that Congress had created other tools for the enforcement of § 5310 and that there was "no strong indication that Congress intended to create additional remedies," the court concluded that no private right of action is to be implied under § 5310. 803 F.Supp. at 731.

The court ruled, however, that § 5310 created a federal right that is enforceable under § 1983. Reading § 5310 literally and finding that its wording reflected an "unambiguous focus on construction workers," 803 F.Supp. at 723, the court concluded that there was "little doubt that § 5310 [wa]s intended to provide laborers with higher wages than they would receive in the absence of this section," 803 F.Supp. at 723, and that by using the command " '*shall*' " in requiring payment of wages at rates not less than the federally recognized prevailing rates, *id.* (emphasis in opinion), Congress indicated its intent to create a binding obligation, *id.* at 725. Given that the Secretary of Labor is required to establish with specificity the minimum rates to be paid laborers and mechanics, the court

concluded that plaintiffs' interests were not vague, ambiguous, or amorphous:

> The contractor knows exactly what wage rates will need to be paid and ... [what] rights are unambiguously conferred on laborers and mechanics. Finally, because the "shall" requirement of § 5310 is directed at the payment of workers' wages, rather than compelling the inclusion of a contract provision ... the requirement is substantive, not procedural.

*Id.*

The court found "no evidence in the legislative history of the HCDA itself that Congress sought to foreclose a § 1983 remedy under § 5310." 803 F.Supp. at 729. It noted that the administrative scheme established for enforcement of § 5310, though sufficient to contraindicate a private right of action directly under that section, was not sufficiently comprehensive to preclude a § 1983 right of action, since there was no provision in the statute for judicial remedies and no provision in the federal regulations for an employee to initiate a proceeding for resolution of disputes. 803 F.Supp. at 727–28.

The court also concluded that the Complaint sufficiently alleged the state action necessary for a § 1983 suit because there was a close nexus between CPC and the municipal defendants:

> Under the close nexus test and the facts presently before the Court, ... CPC can be said to be a state actor. On the basis of the CPC/HPD Contracts and the RFPs, plaintiffs have alleged facts which, if proven true, would demonstrate that municipal defendants had "exercised coercive power or ha[d] provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the government." *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. [522] at 546, 107 S.Ct. [2971] at 2986 [97 L.Ed.2d 427 (1987)] (citations omitted). In particular, plaintiffs assert that the $90–95 cap on the Person Day Rate, which was required by municipal defendants as a condition for awarding the contract, was so low as to make it financially impossible for CPC to pay pre-

vailing wage rates as required under 42 U.S.C. § 5310. In short, plaintiffs have alleged facts asserting that the municipal defendants ensured that any successful bidder would be forced, for economic reasons, to violate 42 U.S.C. § 5310. If proven true, these facts would be sufficient to demonstrate that the municipal defendants "exercised coercive power or ... provided such significant encouragement" as to establish 42 U.S.C. § 1983 state action under the close nexus test.

803 F.Supp. at 720–21.

Accordingly, the district court denied defendants' motions to dismiss to the extent that the Complaint asserted claims under § 1983.

Pursuant to 28 U.S.C. § 1292(b) (1988), the court certified for interlocutory appeal so much of its order as denied defendants' motions to dismiss the § 1983 claims, and this Court granted defendants permission to appeal from that portion of the district court's order. Thereafter, pursuant to Fed.R.Civ.P. 54(b), the district court directed that a final judgment be entered with respect to so much of its order as had granted defendants' motions to dismiss plaintiffs' claims directly under § 5310, finding that there was no just reason for delay and that the relationship between those claims and the § 1983 claims was sufficiently close to make it desirable for this Court to have the opportunity to review both rulings together. Plaintiffs' cross-appeal followed and was consolidated with defendants' appeal.

## II. DISCUSSION

The HCDA, enacted in 1974, provides for federal grants to local governmental units for use in the "development of viable urban communities," in part "by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income," 42 U.S.C. § 5301(c). Section 5310, which requires that certain workers employed on construction projects funded by the HCDA be paid at least at federally recognized prevailing wage rates, provides in pertinent part as follows:

All laborers and mechanics employed by contractors or subcontractors in the performance of construction work financed in whole or in part with assistance received under this chapter shall be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis–Bacon Act, as amended (40 U.S.C. 276a–276a–5) .... The Secretary of Labor shall have, with respect to such labor standards, the authority and functions set forth in Reorganization Plan Numbered 14 of 1950....

42 U.S.C. § 5310(a). The Reorganization Plan referred to (hereinafter "1950 Plan") required federal agencies to cooperate in the enforcement of federal labor standards. Reorganization Plan No. 14 of 1950, 5 U.S.C. app. (1988).

The questions presented by these appeals are (1) whether an action for violation of § 5310 is available to plaintiffs directly under that section; (2) whether an action for violation of § 5310 is available to plaintiffs under § 1983; and (3) if such an action is available under § 1983, whether payment of subminimum wages by CPC can meet § 1983's requirement of state action. We conclude, substantially for the reasons stated by the district court, that the first question should be answered in the negative but that the second and third should be answered in the affirmative.

A. *Implied Private Right of Action Under § 5310*

 Whether an implied private right of action exists under a federal statute is strictly a matter of congressional intent. " '[U]nless th[e] congressional intent [to create such a right] can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.' " *Thompson v. Thompson*, 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988) (quoting *Northwest Airlines, Inc. v. Transport Workers*, 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981)); *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82

(1979) (court's "task is limited solely to determining whether Congress intended to create the private right of action asserted"). "The test reflects a concern, grounded in separation of powers, that Congress rather than the courts controls the availability of remedies for violations of statutes." *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 509 n. 9, 110 S.Ct. 2510, 508 n. 9, 110 L.Ed.2d 455 (1990) (*"Wilder"*).

▌ When the statute itself is silent as to whether it may be enforced by private action, we normally start by examining the four factors set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, to wit, (1) whether the plaintiff is one of the class for whose " '*especial*' " benefit the statute was enacted, "that is, does the statute create a federal right in favor of the plaintiff"; (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; (3) whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff"; and (4) whether the cause of action is "one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* at 78, 95 S.Ct. at 2088 (emphasis in original). All four *Cort v. Ash* factors are guides to determining congressional intent. *See Wilder*, 496 U.S. at 508 n. 9, 110 S.Ct. at 2517 n. 9; *Thompson v. Thompson*, 484 U.S. at 179, 108 S.Ct. at 516; *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Health Care Plan, Inc. v. Aetna Life Insurance Co.*, 966 F.2d 738, 740 (2d Cir.1992). The mere fact that plaintiffs are intended beneficiaries of the statute does not mean that Congress intended the statute to grant them a private right of action to secure that benefit. *See, e.g., id.* at 741. The courts may, for example, infer that Congress did not intend to create such a right of action if it expressly provided other remedies:

> [W]here a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies. . . . In such cases, "[i]n the absence of strong

indicia of contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate."

*Karahalios v. National Federation of Federal Employees, Local 1263*, 489 U.S. 527, 533, 109 S.Ct. 1282, 1286–87, 103 L.Ed.2d 539 (1989) (quoting *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 15, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981)).

Here, though we are persuaded that plaintiffs, as workers on an HCDA–funded project, are a class for whose special benefit § 5310 was enacted (see Part II.B.1. below), neither the statute nor the legislative history gives any indication that Congress intended that section to create a private right of action. Further, though the question is close, we tend to agree with the district court that Congress incorporated a regulatory scheme that is sufficiently detailed to suggest that no private right of action was intended. Under the 1950 Plan, to which Congress referred in § 5310, the Secretary had adopted regulations with respect to Davis–Bacon and related statutes; the regulations included provisions for the predetermination of prevailing wage rates, *see* 29 C.F.R. § 1.1 *et seq.* (1974); for reconsideration or administrative review of a wage determination at the request of "[a]ny interested person," *see id.* §§ 1.8, 1.9; for investigations of complaints, *see id.* § 5.6; and for the resolution by a hearing officer of disputes of fact or law concerning proper classifications and the payment of prevailing wage rates, *see id.* § 5.11.

By its reference to the 1950 Plan in § 5310, Congress indicated that that section could be enforced through these regulatory provisions. Though there was no statement that these would be the exclusive means of enforcement, there simply was no indication that, along with the cited regulatory mechanism, Congress also intended to authorize laborers to bring private suits. Accordingly, we conclude that § 5310 does not contain an implied private right of action.

B. *Enforceability of § 5310 Under § 1983*

▌ The fact that a statute conferring substantive rights does not itself give its

beneficiaries a private right of action to enforce it does not mean that the beneficiaries are without a private remedy. Section 1983, which provides, in pertinent part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured,

42 U.S.C. § 1983, may be available as a vehicle for remedying violations of federal statutes as well as constitutional violations, *see Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Suter v. Artist M.,* —— U.S. ——, ——, 112 S.Ct. 1360, 1366, 118 L.Ed.2d 1 (1992) (*"Suter "*). And unlike the inquiry into whether a substantive statute confers a direct private right of action, the § 1983 inquiry begins with a presumption in favor of the right to bring suit, for the "general rule" is that § 1983 provides a remedy for violations of federal statutory rights unless "Congress has affirmatively withdrawn the remedy," *Wilder,* 496 U.S. at 509 n. 9, 110 S.Ct. at 2517 n. 9.

Nonetheless, though the Supreme Court has "repeatedly held that the coverage of [§ 1983] must be broadly construed," *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 105, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989), not every violation of a federal statute gives rise to a cause of action under § 1983. Section 1983 relief "is not available to enforce a violation of a federal statute 'where Congress has foreclosed such enforcement of the statute in the enactment itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983.' " *Suter,* —— U.S. at ——, 112 S.Ct. at 1366 (quoting *Wright v. City of Roanoke Redevelopment & Housing Authority,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)); *see also Wilder,* 496 U.S. at 508, 110 S.Ct. at 2517. As discussed below, neither circumstance exists here to prevent these plaintiffs from suing under § 1983 for the alleged violations of § 5310.

### 1. Creation of an Enforceable Right

In *Wilder,* the Supreme Court applied a three-part analysis, which is different from the *Cort v. Ash* analysis of the existence of a direct right of action, *see Wilder,* 496 U.S. at 508–09 n. 9, 110 S.Ct. at 2517 n. 9, for determining whether a federal statute creates a right that may be enforced under § 1983. The § 1983 inquiry

> turns on whether "the provision in question was intend[ed] to benefit the putative plaintiff." ... If so, the provision creates an enforceable right unless it reflects merely a "congressional preference" for a certain kind of conduct rather than a binding obligation on the governmental unit ... or unless the interest the plaintiff asserts is " 'too vague and amorphous' " such that it is " 'beyond the competence of the judiciary to enforce.' "

*Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517; *see also Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. at 106, 110 S.Ct. at 449.

The *Wilder* Court considered whether health-care providers could maintain a § 1983 action to enforce a provision of the Medicaid Act that required a state, in order to receive reimbursement, to submit to the Secretary of Health and Human Services ("HHS") a medical assistance plan that set rates which the " 'State finds, and makes assurances satisfactory to [HHS] are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities,' " *Wilder,* 496 U.S. at 503, 110 S.Ct. at 2514 (quoting 42 U.S.C. § 1396a(a)(13)(A) (Supp. V 1982)). The Court found that there was "little doubt that health care providers are the intended beneficiaries" of that provision, *Wilder,* 496 U.S. at 510, 110 S.Ct. at 2517; that the provision imposed a binding obligation on participating states that was "cast in mandatory rather than precatory terms," *id.* at 512, 110 S.Ct. at 2519; and that the obligation was not "too 'vague and amorphous,' " as "the statute and regulation set out factors which a State must consider" and provided objective benchmarks for the assessment of the reasonableness of the rates, *id.* at 519, 110 S.Ct. at 2522–23.

Thus, the Court concluded that the statutory provision created a right that health-care providers could enforce in an action under § 1983.

Two years later, the Supreme Court in *Suter* distinguished *Wilder*, without mentioning its three-part test, in reaching a contrary conclusion as to a different statutory provision. The *Suter* Court considered whether children who were state wards could, under § 1983, enforce a federal statutory provision that conditioned federal reimbursement for state foster care programs on the acceptance by HHS of a state plan containing a provision that " 'reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home. . . .' " —— U.S. at ——, 112 S.Ct. at 1364 (quoting 42 U.S.C. § 671(a)(15)). The *Suter* Court concluded that the children had no right to maintain a §1983 action because (a) there was insufficient statutory guidance as to how "reasonable efforts" were to be measured; (b) the state's mode of compliance was, "within broad limits, left up to the State," —— U.S. at ——, 112 S.Ct. at 1368; and (c) since the statute provided other enforcement mechanisms, the absence of a private remedy under § 1983 did not make the "reasonable efforts" clause ineffectual, —— U.S. at ——, 112 S.Ct. at 1368–69. The Court reasoned that "[t]he term 'reasonable efforts' in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by [HHS]," and thus did not "unambiguously confer an enforceable right upon the Act's beneficiaries." *Id.* at ——, 112 S.Ct. at 1370.

In the present case, we conclude that under either the *Wilder* analysis or, to the extent that it differs, the *Suter* analysis, § 5310 provides these plaintiffs with a right that is sufficiently clear to be enforceable under § 1983. While the ultimate goal of Congress in enacting the HCDA was, as a whole, the development of viable urban communities by providing decent housing and expanding economic opportunities for persons of low and moderate income, there can

be no question that the provision for payment of a certain minimum wage confers its principal benefit on the wage earners. The persons whose wages are the subject of § 5310 are clearly specified: they are "laborers and mechanics." The statutory requirement as to their wages is not merely a hortatory "reasonable efforts" provision; nor is it merely a provision requiring inclusion of wage terms in a state plan; rather, the statute states that at least the required level of wages "shall be paid." Further, the minimum level of those wages is neither vague nor speculative nor left for determination by the states; rather, it is determinable by reference to an unambiguous specified standard set by a federal official—the Secretary of Labor—in accordance with another federal statute—Davis–Bacon.

In sum, there can be little doubt that laborers and mechanics are the intended beneficiaries of an obligation that is cast by § 5310 in mandatory terms and that is readily quantifiable by reference to a stated benchmark as set by a federal official. There is no ambiguity. The contractor is required to pay such workers wages at rates not lower than the federally recognized prevailing rates.

### 2. *Congressional Foreclosure*

 Notwithstanding a clearly conferred federal right, a § 1983 suit would not be available if Congress had manifested its intention to foreclose such a remedy. *Suter*, —— U.S. at ——, 112 S.Ct. at 1366. The courts should " ' "not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy" for the deprivation of a federally secured right.' . . . The burden is on the State to show 'by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement,' " *Wilder*, 496 U.S. at 520–21, 110 S.Ct. at 2523 (citations omitted). Such "other specific evidence" may include provision of a scheme of remedial devices that is sufficiently comprehensive to demonstrate congressional intent to preclude the remedy of suits under § 1983. *See, e.g.*, *Wilder*, 496 U.S. at 521, 110 S.Ct. at 2523–24; *Middlesex County Sewerage Authority v.*

*National Sea Clammers Ass'n*, 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981) ("*Sea Clammers*"). In *Sea Clammers*, for example, the Court dealt with claims under the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*, and the Marine Protection, Research, and Sanctuaries Act of 1972, 33 U.S.C. § 1401 *et seq.* The statutes themselves contained "unusually elaborate enforcement provisions," 453 U.S. at 13, including, for example, provisions in the water pollution statute (a) authorizing the Environmental Protection Agency Administrator to seek civil penalties of up to $10,000 a day, as well as criminal penalties, (b) allowing "any interested person" to seek review of agency actions in federal courts, and (c) allowing citizens to sue for injunctions or for civil penalties payable to the government, 453 U.S. at 13–14 & n. 25, 101 S.Ct. at 2623 & n. 25. The *Sea Clammers* Court concluded that because Congress "created so many specific statutory remedies, including the . . . citizen-suit provisions," it "intended to supplant any remedy that otherwise would be available under § 1983." 453 U.S. at 20–21, 101 S.Ct. at 2626–27. *See also Smith v. Robinson*, 468 U.S. 992, 1003, 104 S.Ct. 3457, 3464, 82 L.Ed.2d 746 (1984) ("when a statute creates a comprehensive remedial scheme, intentional 'omissions' from that scheme should not be supplanted by the remedial apparatus of § 1983").

The statutory scheme provided by § 5310 is not so comprehensive. The HCDA itself, though it allows the Secretary of Labor to ask the Attorney General to bring a civil action against a grant recipient for noncompliance with the Act, *see* 42 U.S.C. §§ 5311(b); 5309(b)–(c), makes no reference to any other type of civil suit. As discussed in Part II.A. above, § 5310 authorizes the Secretary of Labor to cooperate with other federal agencies in enforcement and in effect adopts the regulatory scheme fashioned by the Secretary. Even that scheme, however, though providing for the determination of prevailing wage rates, the investigation of complaints, and the resolution of wage disputes, does not make provision for laborers to enforce their rights administratively. The dispute-resolution proceedings may be initiated only by the federal agency administering the HCDA contract, the Secretary, or an HCDA contractor or subcontractor. *See* 29 C.F.R. § 5.11(a) (1992). Indeed, at the time the HCDA was enacted, the regulations apparently permitted only the contract-administering agency to initiate such proceedings. *See* 29 C.F.R. § 5.11(b) (1974). The laborers who are the beneficiaries of § 5310 were not and are not allowed to initiate administrative dispute-resolution proceedings. Nor is there any provision for a laborer to obtain judicial review of any administrative decision. In sum, we do not see in § 5310 recognition of a regulatory scheme of such comprehensiveness as to manifest an affirmative congressional intent to preclude invocation of § 1983 as a remedy.

In arguing that Congress intended to preclude use of § 1983 actions to enforce § 5310, defendants rely heavily on *Universities Research Assn. v. Coutu*, 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981) ("*Coutu*"), which held that there was no private right of action under Davis–Bacon for back wages where (a) the contract did not provide for Davis–Bacon wage levels, and (b) there had been an administrative predetermination that the contract did not call for Davis–Bacon work. The *Coutu* Court noted that a contractor needs to know in advance what its labor costs will be and reasoned that implication of a private right of action under Davis–Bacon to sue on a contract that had been predetermined not to call for Davis–Bacon wages would "destroy [the] careful balance" created between contractors and employees. 450 U.S. at 782, 101 S.Ct. at 1467.

For several reasons, this ruling does not suggest foreclosure of the § 1983 claims asserted here. First, the conclusion that a direct action may not be brought to enforce Davis–Bacon rights where it had been administratively predetermined that Davis–Bacon did not apply would not be persuasive authority for even the proposition that no *direct* action may be brought to enforce a contract that expressly requires the payment of wages at Davis–Bacon levels. Indeed, the *Coutu* Court expressly "d[id] not decide whether the [Davis–Bacon] Act creates an implied private right of action to enforce a contract that contains specific Davis–Bacon

Act stipulations." 450 U.S. at 769, 101 S.Ct. at 1460. Second, *Coutu*'s concern for the contractor's need to know in advance its labor costs is not an issue here, since the Contracts expressly required the payment of wages at Davis–Bacon levels. Finally, and most importantly, *Coutu* concerned only whether the action could be brought directly under Davis–Bacon, not whether it could be brought under § 1983. Though there can be no implied direct private right of action unless Congress demonstrably intended to create one, the § 1983 remedy is presumptively available unless Congress has affirmatively withdrawn it. As indicated above, we have seen no indication that Congress meant to withdraw the § 1983 remedy for violation of § 5310 where the contracts expressly call for payment of wages at rates not lower than the federally recognized prevailing rates.

In sum, we conclude that § 1983 is available as a remedy for state action that violated § 5310.

## C. *State Action*

■■■ An action under § 1983 cannot, of course, be maintained unless the challenged conduct was attributable at least in part to a person acting under color of state law. *See, e.g., Rendell–Baker v. Kohn,* 457 U.S. 830, 835, 102 S.Ct. 2764, 2768, 73 L.Ed.2d 418 (1982); *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993). Thus, plaintiffs must plead and prove that the relationship between CPC, which paid their wages, and the municipal defendants, which established limitations on the wages that could be paid, was sufficient to permit an inference that CPC acted not as an independent organization, but an arm of the state.

■■■ Actions by a private party are deemed state action if "there is a sufficiently close nexus between the State and the challenged action" that the actions by the private parties "may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974); *see Hadges v. Yonkers Racing Corp.,* 918 F.2d 1079, 1081 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1583, 113 L.Ed.2d 648 (1991). The "close nexus" test is not satisfied merely by

the fact that the private entity is a business " 'affected with the public interest,' " *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 353, 95 S.Ct. at 455; or that the state " 'approv[ed] of or acquiesce[d] in the initiatives' " of the private entity, *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 547, 107 S.Ct. 2971, 2985, 97 L.Ed.2d 427 (1987) *("San Francisco")* (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1004–05, 102 S.Ct. 2777, 2785–86, 73 L.Ed.2d 534 (1982)); or that a business is subject to extensive regulation, *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 350, 95 S.Ct. at 453, was publicly subsidized, *San Francisco,* 483 U.S. at 544, 107 S.Ct. at 2985, or had been given monopoly status by the state, *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 351–52, 95 S.Ct. at 454. "Acts of ... private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Rendell–Baker v. Kohn,* 457 U.S. at 841, 102 S.Ct. at 2771. "The purpose of [the close-nexus] requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky,* 457 U.S. at 1004, 102 S.Ct. at 2786 (emphasis in original). Such responsibility may be found when, after the facts are sifted and weighed, it is evidence that a state or its political subdivision " 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [state or political subdivision].' " *San Francisco,* 483 U.S. at 546, 107 S.Ct. at 2986 (quoting *Blum v. Yaretsky,* 457 U.S. at 1004, 102 S.Ct. at 2786).

The present Complaint meets the close-nexus test because the facts alleged, and supported by the Contracts relied on, easily permit the inference that CPC could not pay wages at the level required by § 5310 because of strictures imposed by the municipal defendants. The HPD RFPs provided that the contractor's overall budget was to be determined by setting a "Person–Day Rate," multiplied by the number of trainees, multiplied by the number of days worked. The

Person–Day Rate was to include wages paid to the worker and all other expenses of running the program, and HPD placed a dollar ceiling on the Person–Day Rate. For the 1986–87 Contract, that ceiling was $90; for the other years, the ceiling was $95. Both ceilings were below the federally recognized prevailing wage minima for a full day's work. Thus, to win the Contracts, CPC was required to make its bids based on wages below those levels; it was paid a sum that did not give it sufficient funds to pay wages at the § 5310 required minimum levels; and it was prohibited by the Contracts from receiving any additional funding for the work performed thereunder.

In sum, the facts alleged would suffice to permit a finding that HPD effectively required CPC to pay less than the minimum wages required by § 5310, that the actions of CPC in paying those subminimum wages were the responsibility of the municipal defendants, and that CPC's conduct was therefore state action.

Defendants also contend that even if CPC's wage payments were constrained by the municipal defendants, CPC could not be deemed a state actor because the municipal defendants themselves were engaged only in federal, not state, action, as they merely expended federal funds under the HCDA. We reject this contention for the principal reason that the "Person–Day Rate" set by the RFPs, along with the provision that the contractor could not obtain other funding to pay its workers, apparently represented an attempt by the City to limit any call upon its own treasury for the projects in question. These restrictions were not required by any federal provision. Thus, the underpayment of wages cannot be attributed to the federal government; and the municipal defendants in limiting the wages that could be paid and CPC in paying the wages as thus limited cannot legitimately claim to have been federal, rather than state, actors.

We conclude that the district court properly denied defendants' motions to dismiss plaintiffs' § 1983 claims.

## CONCLUSION

The order and judgment of the district court are affirmed. Costs to plaintiffs.